## L. RICHARDSON & COMPANY, INC. *v.* UNITED STATES.

### APPEAL FROM THE COURT OF CLAIMS.

No. 142.   Argued December 10, 11, 1924.—Decided January 5, 1925.

Allegations of a petition in the Court of Claims *held* insufficient to show an agreement upon the part of the United States to purchase claimant's wool.

58 Ct. Clms. 717, affirmed.

APPEAL from a judgment of the Court of Claims dismissing a petition upon demurrer.

*Mr. Raymond M. Hudson* for appellant.

*Mr. Alfred A. Wheat,* Special Assistant to the Attorney General, with whom *Mr. Solicitor General Beck* was on the brief, for the United States.

MR. JUSTICE SANFORD delivered the opinion of the Court.

This action was brought by L. Richardson & Company, Inc., to recover damages for the breach of an agreement al-

leged to have been made by the United States for the purchase of a quantity of wool, grading higher than fifty-sixes, imported by the claimant from South Africa. The United States demurred to the petition on the ground that it did not state a cause of action. This demurrer was sustained, without opinion, and judgment entered dismissing the petition. 58 Ct. Clms. 717.

In November, 1917, the President issued a Proclamation prohibiting the importation of wool and other enumerated articles into the United States, except under licenses granted by the War Trade Board, in accordance with its regulations or orders.[1] In December, the Board issued a regulation requiring every applicant for a wool import license to sign an agreement granting the United States an option to purchase all or any part of the wool covered by the application, for ten days after its custom house entry, at a specified price basis. In January, 1918, this was superseded by another regulation issued by the Board, requiring that the importers of wool should sign agreements granting such options of purchase to the United States, before the delivery or release of the wool to them. Thereafter, as appears from exhibits to the petition, the Quartermaster General of the Army wrote certain letters containing announcements as to the grades of wool on which it was intended to exercise the options granted to the Government by the importers. These are described in the petition as " regulations issued by the Quartermaster General in behalf of the War Department;" and it is alleged that under them he exercised the options on the grades of wool enumerated and thereby made " purchases " of such wool. Two of them were written to the Wool Administrator, an official in the Quartermaster Corps. In one of these, dated April 1, 1918, the Wool Administrator was directed to announce, among other things, that the

---

[1] 40 Stat. 1721. This Board had been established by the President by an Executive Order of Oct. 12, 1917.

Quartermaster Corps would not exercise the option in respect to wool finer than fifty-sixes that had been bought prior to April 1, but reserved the right to exercise it on wool bought on or after that date. In the other, dated May 17, the Quartermaster General announced that the War Industries Board having then fixed the price of wool in the United States, he would " until further notice " exercise the import license option on all imported wool, except that grading above fifty-sixes bought prior to April 1, and certain wool grading forties and below; and directed the Wool Administrator to distribute this information to all importers interested. The petition alleges that this " regulation " was issued through the Wool Top and Yarn Branch of the Quartermaster General's Office, and was an exercise of the option retained by the Government under the " regulation " of April 1, on all wool imported into the United States after April 1 that graded above fifty-sixes.

The petition further alleges, in general and indefinite terms, without giving details, and omitting many specific dates, that " subsequent to April 1, 1918, and prior to July 12, 1918," the claimant purchased 7168 bales and 1518 bags of South African wool of the grade finer than fifty-sixes, and duly executed the proper import license applications and the options and agreements to sell to the Government as required under the January regulation of the War Trade Board; that under said options and agreements and by the " regulation " of May 17, the Government agreed to buy this wool and to pay the claimant therefor " $1,434,045.60, being the price fixed by the War Industries Board "; that " subsequent to May 17," the " Government officers " cancelled the claimant's import licenses and issued new ones requiring that the wool be consigned to a designated Government agency and that the bills of lading be assigned to the Quartermaster Gen-

eral;[2] that on July 18, when the claimant sought to charter
a vessel from the Shipping Board to transport a part of
the wool, it was required to guarantee that only wool des-
tined for the Quartermaster General would be carried;
that on December 23, 1918, the Wool Administrator, who
"was authorized by the Quartermaster General and by
the Government to buy and accept said wool," wrote the
claimant a letter stating that he had notified its agent
that he would take 17,200 bales of wool therein described,
including the said 7,168 bales and 1,518 bags, which, it is
alleged, "he so agreed to buy;" that the claimant im-
ported said wool and offered delivery thereof to the Gov-
ernment, but that although the Government accepted and
paid for part of said 17,200 bales it arbitrarily refused
to accept and pay for said 7,168 bales and 1,518 bags;
that the claimant was forced to dispose of this wool, and
obtained the best possible price therefor, realizing, after
deducting the cost of resale, $270,746 less than the price
fixed by the War Industries Board; and that the claimant
was caused to lose this sum by the Government's refusal
to accept and pay for this wool "as it had agreed to do."
The claimant prays judgment for this sum on account
of the violation of "said agreement" of the United States
to purchase and pay for the wool, and for general relief.

The petition does not show whether the claimant
bought this wool before or after the "regulation" of May
17. And it does not show the dates on which the claim-
ant either applied for the import licenses, executed the
option agreements, shipped the wool from South Africa,
imported it into the United States, or tendered delivery
to the Government.

---

[2] It appears from the petition that on July 12 the War Trade Board,
after consultation with the War Industries Board and War Depart-
ment, issued a "ruling" revoking all outstanding licenses for the
importation of wool from South Africa and other countries on ship-
ments made after July 28, and providing that no licenses for such
importations should be issued except to the Quartermaster General.

It is clear that the demurrer was rightly sustained.

The facts alleged do not show that any authorized officer of the Government entered into any "agreement" to purchase the claimant's wool, as claimed in the petition. The letter of May 17 from the Quartermaster General to the Wool Administrator—which is incorrectly characterized in the petition as a "regulation" issued in behalf of the War Department—manifestly did not constitute an exercise of the options granted to the Government to purchase any or all wools finer than fifty-sixes bought after April 1, but was merely an announcement of the intention of the Quartermaster General as to the exercise of such options, and, at the most, an instruction to the Wool Administrator in reference to the exercise thereof. It neither constituted an agreement to purchase any or all of the wools that might be imported by any particular importer, nor a purchase of them. Nor is it alleged in the petition that at the time the claimant's wool was imported, the "regulation" of May 17 was in force, or that the Quartermaster General had not given "further notice" in reference to the exercise of the options on wools imported after the Armistice.

There is no averment that either the "Government officers" who required the bills of lading to be assigned to the Quartermaster General, or the Shipping Board which required a guarantee that a vessel chartered by the claimant should carry only wool destined for the Quartermaster General, had, or assumed to have, any authority to purchase wool for the Government; and it is clear that their actions did not constitute an agreement binding the United States to exercise the options on any of the wool thus imported.

Nor does the Wool Administrator's letter of December 23 constitute an agreement to purchase the wool. The letter itself, a copy of which is exhibited with the petition, shows no such agreement. It merely notified the claim-

ant that the Wool Administrator had written to its agent stating that he would take 17,200 bales of wool—which apparently had not then been imported—or the "scoured product" thereof. It does not appear to be an exercise by the Government of any options previously executed by the claimant; it mentions no prices; and it states that as to 14,200 bales of this wool which the claimant had bought in the grease, the "scoured product" would be taken, on the basis of a 35 per cent. shrinkage. The petition does not allege that the claimant had given the Government any options to purchase the wool on this basis, or that the proposal of the Wool Administrator to take it on this basis was ever accepted by the claimant. In short, it does not appear that any agreement was ever reached between the claimant and the Wool Administrator as to the terms and conditions on which the wool should be taken by the Government.

It is unnecessary to review in detail various contentions urged in behalf of the claimant. They show no error in the judgment of the Court of Claims; and it is

*Affirmed.*